FELICE JOHN VITI, Acting United States Attorney (#7007)
JOEY L. BLANCH, Assistant United States Attorney (#16665)
RACHEL L. ROTHBERG, Trial Attorney, DOJ CEOS California #331595
Attorneys for the United States of America
Office of the United States Attorney
111 South Main Street, Suite 1800
Salt Lake City, Utah 84111-2176
Telephone: (801)524-5682

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM JAMES PURDY,<br><br>Defendant. | **UNITED STATES' POSITION REGARDING DETENTION**<br><br>Case No. 2:25-cr-00277 |

☐     The United States is not seeking detention.

☒     The United States moves for detention based on current information. The United States' positions in this preliminary pleading could change after reviewing the Pretrial Report or learning of additional evidence. The United States reserves the right to assert positions even if the boxes next to those positions are not checked below, raise additional arguments, and file additional pleadings in support of detention. The United States' motion for detention is:

☒     Pursuant to 18 U.S.C. § 3142(f)(1) because defendant is charged with:

    ☒     **(A)** a crime of violence (*see* 18 U.S.C. § 3156(a)(4)), a violation of 18 U.S.C. § 1591 (sex trafficking of children), or an offense under § 2332b(g)(5)(B) (specific enumerated crimes) for which a maximum term of imprisonment of 10 years or more is prescribed; **or**

    ☐     **(B)** an offense for which the maximum sentence is life imprisonment or death; **or**

☐ **(C)** an offense for which a maximum term of imprisonment of 10 years or more is prescribed in the Controlled Substances Act (21 U.S.C. §§ 801-904), the Controlled Substances Import and Export Act (21 U.S.C. §§ 951-971), or Chapter 705 of Title 46, U.S.C. (46 U.S.C. §§ 70501-70508); **or**

☐ **(D)** any felony if the defendant has been convicted of two or more offenses described in (a) through (c) above, or two or more State or local offenses that would have been offenses described in (a) through (c) above if a circumstance giving rise to Federal jurisdiction had existed, or a combination of such offenses; **or**

☒ **(E)** any felony that is not otherwise a crime of violence but involves: **(i)** a minor victim; **(ii)** the possession or use of a firearm or destructive device (as defined in 18 U.S.C. § 921); **(iii)** any other dangerous weapon; or **(iv)** a failure to register under 18 U.S.C. § 2250;

**OR**

☒ Pursuant to 18 U.S.C. § 3142(f)(2) because the case involves:

☒ **(A)** a serious risk the defendant will flee; **or**
☒ **(B)** a serious risk the defendant will obstruct or attempt to obstruct justice, or threaten, injure, intimidate, attempt to threaten, injure or intimidate a prospective witness or juror.

**Procedure**

The defendant may seek a continuance of the detention hearing of up to five days, and the United States may seek a continuance of up to three days. 18 U.S.C. § 3142(f). During any such continuance, the defendant shall be detained. *Id*. The rules concerning the admissibility of evidence do not apply at the detention hearing. *Id*. The United States has the burden of persuasion by clear and convincing evidence that no condition or combination of conditions of release will reasonably the safety of any other person and the community or by a preponderance of evidence that no condition or combination of conditions of release will reasonably assure the defendant's appearance as required. *Id*.; *United States v. Cisneros*, 328 F.3d 610, 616 (10th Cir. 2003).

**Rebuttable Presumption**

☒ A rebuttable presumption applies and the defendant bears the burden to produce some credible evidence to rebut this presumption. The United States acknowledges that it

2

retains the burden of persuasion.  The statutory presumption applies:

☐ Pursuant to 18 U.S.C. § 3142(e)(2) *(previous violator)*: There is a rebuttable presumption that no condition or combination of conditions will reasonably assure the safety of any other person and the community because:

**(A)** the defendant has previously been convicted of a Federal offense that is described in 18 U.S.C. § 3142(f)(1), or of a State or local offense that would have been such an offense if a circumstance giving rise to Federal jurisdiction had existed; ***and***

**(B)** the defendant committed that offense while on release pending trial for a Federal, State, or local offense; ***and***

**(C)** a period of not more than five years has elapsed since the date of conviction, or the release of the defendant from imprisonment, for that, whichever is later.

☒ Pursuant to 18 U.S.C. § 3142(e)(3) *(narcotics, firearm, other offenses)*: There is a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community because there is probable cause to believe that the defendant committed one or more of the following offenses:

☐ **(A)** an offense for which a maximum term of imprisonment of 10 years or more is prescribed in the Controlled Substances Act (21 U.S.C. §§ 801-904), the Controlled Substances Import and Export Act (21 U.S.C. §§ 951-971), or Chapter 705 of Title 46, U.S.C. (46 U.S.C. §§ 70501-70508);

☐ **(B)** an offense under 18 U.S.C. §§ 924(c), 956(a), or 2332b;

☐ **(C)** an offense listed in 18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 or more is prescribed;

☐ **(D)** an offense under Chapter 77 of Title 18, U.S.C. (18 U.S.C. §§ 1581-1597) for which a maximum term of imprisonment of 20 years or more is prescribed; **or**

☒ **(E)** an offense involving a minor victim under 18 U.S.C. §§ 1201, 1591, 2241, 2242, 2244(a)(1), 2245, 2251, 2251A, 2252(a)(1), 2252(a)(2), 2252(a)(3), 2252A(a)(1), 2252A(a)(2), 2252A(a)(3), 2252A(a)(4), 2260, 2421, 2422, 2423, or 2425.

### Factors to Be Considered

The United States may present arguments, proffer evidence, or provide testimony at the scheduled detention hearing supporting the detention of the defendant including,

but not limited to:

☒ The nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm or destructive device.  (18 U.S.C. § 3142(g)(1)).

☒ The weight of evidence against the defendant.  (18 U.S.C. § 3142(g)(2)).

☒ The history and characteristics of the defendant including the defendant's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history and record concerning court proceedings.  (18 U.S.C. § 3142(g)(3)(A)).

☐ Whether, at time of the current offense or arrest, the defendant was on probation, parole, or other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law.  (18 U.S.C. § 3142(g)(3)(B)).

☒ The nature and seriousness of danger to any person or to the community that would be posed by the defendant's release.  (18 U.S.C. § 3142(g)(4)).

☐ The defendant's lack of legal status in the United States.  The defendant's legal status is:
☐ How the defendant would be subject to removal or deportation after serving a period of incarceration.
☐ The defendant's significant family or other ties outside of the United States.
☒ The defendant's use of aliases or false documents.
☒ The defendant's prior attempts to evade law enforcement.
☐ How the defendant's proposed residence, employment, or proposed treatment programs have not been verified.
☒ The defendant's prior failures to appear for court proceedings.

☒ Other reasons including:

The nature and characteristics of the defendant indicate that he is a danger to the community, a flight risk, and poses a risk of obstruction of justice or witness tampering,

and should be detained prior to trial.

*          *          *

As detailed below, for years, William James Purdy, a U.S. Citizen, capitalized on his status as a person in a position of public trust — first as a Mormon missionary in 2017-2018 and then as an educator in 2020-2023 — to gain access to, groom, and sexually abuse numerous minor boys in the Kingdom of Tonga. He preyed upon boys in remote communities, boys who did not have access to the same resources as he did. He chose boys who were unlikely to speak out about this abuse because of their conservative, religious culture and the stigma associated with male-on-male sexual abuse in their community, not to mention the shame normally associated with the disclosure of sexual abuse. He repeatedly abused his victims, bribing them with gifts, money, and other promises — enticements that both gave him access to his victims and kept them quiet. Purdy convinced the victims' parents to let their sons come to his apartments and spend time alone with him; some of the victims even lived with Purdy, as he promised to take care of them and their education. All the time, he was sexually abusing them. He was also recording them with hidden cameras placed in the bathrooms. Even after one of his victims reported to law enforcement and he faced criminal charges in Tonga, Purdy continued abusing some of his victims. Purdy then fled Tonga. He is still a fugitive from the charges pending there.

### Purdy's Indictment in the Kingdom of Tonga on Charges for Sexually Abusing an 8-year-old boy

Purdy's abuse of minors initially came to light when, in October 2022, one brave child — an 8-year-old boy (Minor Victim L) — reported what had happened during his weekly private tutoring session with Purdy: Purdy had been touching his penis for months, but this time, he forcibly performed oral sex on the boy in the boy's own bedroom. In committing this act, Purdy had flagrantly disregarded the family's prior orders not to enter the house. The following day, Purdy wrote to Minor Victim L's aunt to "apologize for [his] inappropriate behavior yesterday."[1]

Shortly after Minor Victim L disclosed Purdy's abuse, Purdy was arrested and indicted in Tonga on three counts of "Indecent Assault on a Child," all related to Minor Victim L. He spent several days in jail before his release on bond.

While this was happening, Purdy was supported by the mothers of boys later determined to be additional victims of Purdy. He had fooled these mothers for years into believing he was a trustworthy caretaker of their sons. For example, Minor Victim A's mother wrote a letter to the court on behalf of Purdy to confirm that he had been providing

---

[1] Purdy has since characterized this incident as physical, non-sexual conduct (*i.e.*, smacking the child).

"full-time care for and assisting" her son for the past three years. She stated that Purdy had been acting as an "older brother" and "surrogate father" to her son, who stayed full-time with Purdy. She said Purdy had assisted in providing for her son, including his school fees. She considered Purdy to be a "trustworthy man" who was "deeply committed to Tonga and especially to providing care for [her son]." As set forth in detail below, it was subsequently determined Purdy had molested Minor Victim A hundreds of times.

### *Purdy's Escape from Tonga While Released on Bond*

As part of his pretrial release in Tonga, Purdy's U.S. passport was confiscated. Yet he repeatedly booked flights back to the United States before his scheduled trial and sought to travel home for various reasons, promising under oath that he would return to face the charges. On December 15, 2022, Purdy submitted a sworn Affidavit in Support of his Application to Vary Bail, promising: "*I have no plan to travel and not return for my trial*. Since I came to Tonga I have considered myself a Tongan and Tonga to be my country because … I really like the Tongan behaviour and the way of living in Tonga." GX1 at ¶6(a), (b) (translated version, emphasis added).

In that same affidavit, Purdy further affirmed, "I intend to plead not guilty to the charge against me, and *I really want to return for my trial* to show that I did not commit any such crime, because it greatly contradicts my faith." *Id.* at ¶6(i). He swore, "I will not (sic) from my trial, and *I will obey fully the orders of the Court* until such a time I return for the trial." *Id.* at ¶8 (emphasis added).

On January 26, 2023, in another bail application, Purdy again swore, under oath: "*I fully intend to return to Tonga* following my recovery after surgery…as I really need to defend me from the accusation that being accused me of and to clear my name from this very serious allegations." *See* GX2 at ¶5 (emphasis added). He affirmed, "I hereby confirm that as soon my eye surgery done and myself recovered *I will be return back here to attend my trial pending in court*, which the trial date has been set to be heard on 24th of April 2023[.]" *Id.* at ¶12. He attached a letter to the Court, explaining, "I would like it made clear that *I fully intend to return to Tonga* following my recovery after surgery and be able to clear my name. Tonga is my home. This is where I live, work, school, and have invested so much of myself." GX 2, at 5. Purdy emphasized, "I understand the gravity of the situation and that this requires a significant amount of trust from the Court. *I only hope you will understand that my reasons for a temporary visit to the U.S. are legitimate and that I will return to Tonga*, the country I have made my home, to be able to exonerate myself." *Id.* He asked that the Court to "please grant me this opportunity to save my vision and ease the burden on my family. *I will then return and prepare for my trial*." *Id.*

The following day, the Tongan Court denied his request, noting the exaggerations and falsehoods in the defendant's application. The Court noted that his alleged diagnosis of keratoconus and a prior 2013 "surgery" was "more akin to a procedure with a vitamin

C solution put in the eye and that was activated by ultraviolet light and that it took some 30 minutes to complete." Although the Court received a letter signed by a doctor, stating that Purdy's "visual acuity is decreasing and recommends that he receives the same treatment as soon as possible, which is not available here in Tonga," the defense conceded that Purdy himself wrote that letter and then had the doctor sign off on it. The Court concluded, based on additional information received from the prosecution and doctor, that the procedure was not urgent and that no medical literature supported the urgency of treatment. Balancing the real medical needs against the nature and gravity of the allegation — and the possible sentence upon conviction — the Court concluded "that there is a real risk the defendant will not return to Tonga for his trial."

The defendant's mother, Susan Purdy, then came to Tonga to lobby on her son's behalf, arguing that the Tongan process was so slow that the judge's denial was akin to "condemning him to blindness." She wrote multiple letters during this process, promising, "I will make sure William does the right thing and returns for any trial or any kind of plea deal and sentencing."

On February 14, 2023, Purdy swore out another affidavit, in support of another bail application: "*I undertake on oath to return to Tonga for my trial, and there is no intention on my part to run away from trial*." GX3 at ¶6. Purdy's requests to return to the United States were ultimately never granted.

Unwilling to accept the Court's decision — or his pretrial release conditions — Purdy took matters into his own hands. On March 27, 2023, Purdy — who is not a citizen of Tonga — submitted an application for a Tongan passport. He used his own photograph but the name of a mentally disabled Tongan man. GX4. He successfully obtained a Tongan passport in this assumed identity. On March 29, 2023, Purdy reported to the Tonga Central Police in Nuku'alofa, as was required per his release conditions. The very next day, on March 30, 2023, Purdy fled Tonga, traveling to Fiji using the fraudulently obtained Tongan passport under the assumed identity. His trial date was scheduled for April 24, 2023.





(CCTV Screenshots from Fuaʻamotu International Airport in Tongatapu, Tonga on

**March 30, 2023, when Purdy was fleeing to Fiji)**

Once in Fiji, Purdy went to the U.S. Embassy-Suva and applied for an emergency replacement passport in order to return to the United States.  In his passport application, Purdy checked a box on the form, indicating that his U.S. passport was "stolen"; in the comments he stated, "It was taken from me in Tonga."  This was misleading — his passport was "taken" from him by Tongan officials, but only because he was under indictment and on pretrial conditions, which banned him from travel.

Purdy was issued an emergency passport that same day and departed Fiji, flying back to Utah via San Francisco.  He returned to his parent's home in West Valley City, Utah.

On March 31, 2023, a bench warrant was issued for Purdy's arrest in Tonga. Multiple co-conspirators have been investigated and charged for helping Purdy flee the country.  Unsurprisingly, Purdy's sworn promises that if he was allowed to leave the country he would return to Tonga to face charges proved to be false.  He has never returned to Tonga, and the warrant for his arrest there remains outstanding.

Purdy remained living at his parent's Utah home, and it is still his official address according to Utah DMV records.  However, he is currently enrolled in law school in Pittsburgh and working as a summer intern at a law firm there between his first and second years.

***Investigation into Purdy's Yearslong Sexual Abuse in Tonga***

With Purdy gone from Tonga, the extended, yearslong web of his sexual abuse — the gravity and extent of criminal conduct and his lengthy trail of Tongan victims — slowly came to light. Through the international cooperation of Homeland Security Investigations (HSI), Diplomatic Security Services (DSS), and the Tonga Police Department, law enforcement has identified 14 minor victims thus far.  In child forensic interviews conducted by HSI, these victims have disclosed hundreds of instances of sexual abuse, and attempted sexual abuse, by Purdy while Purdy was living in Tonga.[2]

The disclosures by the victims and the corroborating evidence from other witnesses, including the victims' parents, are remarkably consistent and reveal Purdy's modus operandi.  As further detailed below, Purdy groomed and manipulated these minor victims and their parents.  He bought them candy, toys, food and drinks, clothing and shoes, cellphones, gaming devices, a ukulele and digital keyboard, and birthday gifts. He gave cash to his minor victims.  He drove them to stores and took them on trips.  Parents trusted

---

[2] These interviews were recently conducted in Tonga and New Zealand by a trained child/adolescent forensic interviewer (a "CAFI") with HSI.

him when he was serving as a Mormon missionary, and he took advantage of their goodwill and the fact that he was a member of the church.  Likewise, when he returned to Tonga as a presumably trustworthy teacher, Purdy offered the minor victims' parents extra tutoring and classes for their children; he would teach the minor victims after-hours, and house and feed them as well — all to get these children under his roof and under his control.  The mother of Minor Victim B and M, for instance, emotionally disclosed that she felt Purdy tricked her into allowing her sons to stay with him, and she was deeply ashamed.  She, like all the adults he manipulated, had no idea that Purdy was sexually abusing her two sons.  When Purdy was briefly incarcerated, he lied to his Tongan contacts, claiming he was being held for alleged physical discipline of a Tongan boy he was tutoring.

The victims consistently disclosed that Purdy would invite them to his home to play video games, pay for their snacks, and use the WiFi.  At Purdy's invitation, some of the boys moved into Purdy's residence and lived with him.  Typically, Purdy would bring the boys into his bedroom, pull down their pants, and instruct them to watch pornography on his cellphone while Purdy performed oral sex on them.  Further, multiple boys disclosed that for most of his time teaching in Tonga, Purdy lived in residences with two bathrooms.  Purdy would instruct the boys to use the bathroom attached to Purdy's bedroom, even though there was another bathroom available that did not require going through Purdy's bedroom to access it.  The evidence on Purdy's computer, seized from his Utah residence upon his return, indicated that Purdy had set up hidden cameras in his bathroom to record the boys in intimate moments such as using the toilet, bathing, and even masturbating.

### Purdy's Initial Travel to Tonga as an LDS Missionary

Purdy initially traveled to Tonga in February 2017 to serve a mission with The Church of Jesus Christ of Latter-day saints (LDS).  He lived in remote, geographically isolated island chains that required a full-day boat trip to visit.  While there on his mission, he raped Minor Victims C, D, E, and J — who were as young as 8 years old.  Two were brothers.  Among other things, he performed oral sex on three of the minors and anally raped one of them multiple times.  These victims described the physical pain they experienced, the instructions Purdy gave while committing these criminal acts, and how Purdy told them not to tell anyone.

These acts were largely committed on church property, where Purdy lured the boys with access to electronics such as a Nintendo switch and remote-controlled cars and helicopters.  No one else had these kinds of toys and games, and Purdy, as a missionary, was not supposed to have electronics either.  Purdy bought the kids anything they wanted — ordering packages from the United States — and bought them snacks, fireworks, and other items of value.  He offered cash and cellphones in exchange for sexual acts.  He told them that he was an adopted child and that his adoptive parents were rich.  Witnesses report that throughout his mission, Purdy (also known as "Peti") did not spend time with any adults.

10

***Purdy's Return to Tonga in 2019***

When Purdy returned to the United States after his mission, he maintained contact with the family of Minor Victims C and D, asking what gifts he could send the boys. He asked to spend Christmas in December 2019 with the family of these minor victims before he began a teaching position at an international school in Nuku'alofa (on the island of Tongatapu). He graduated from the University of Utah early so that he could return to Tonga and be surrounded by children.

When Purdy visited in late 2019, he again sexually assaulted Victims C, D, and E, committing the same kinds of sexual assaults on these boys he had committed when on his mission — including oral sex and anal sodomy. He gave the boys cash, a cellphone, and even purchased a ferry pass for one victim to travel to Tongatapu, stay with him, and provide for his education. When the boy eventually refused additional sexual advances, Purdy kicked that victim out of his apartment and made him walk to his aunt's house in another town.

In January 2020, Purdy began teaching at the international school, where he had his pick of victims. He had male students give him back and foot massages as "punishment" and offered them extra tutoring outside of school hours. Minor Victim I, for instance, went to Purdy's residence for extra classes prior to exams. While he was there, Purdy let him play a video game and then forced himself upon the boy, performing oral sex on him. The next day, that victim received extra credit in class. The same victim was touched by Purdy in the classroom, behind a door, so that other kids could not see them.

Purdy soon had various students living with him, under the guise of tutoring and providing enrichment for their studies. In reality, he was regularly abusing these boys — what he (and they) called "do[ing] the deal." In exchange for living with Purdy and receiving various gifts, they had to allow Purdy to perform oral sex on them. Multiple victims described the sexual abuse they were required to engage in to stay at Purdy's and have access to his internet, the latest videogames, and all the other electronic devices and gifts that Purdy showered upon them. Minor Victim B, who lived with Purdy for years, was sexually abused on a near-daily basis; in exchange for Purdy sucking his penis, Purdy would offer him, among other things, new PlayStation games, cash, shoes, clothes, and a new cellphone.

Minor Victim A, a close friend of Minor Victim B and F, appeared to be Purdy's preferred victim, who he "adopted", and had a special relationship with. Minor Victim A was invited to live with Purdy in early 2020. Like Minor Victim B, Minor Victim A was regularly abused for approximately three years while he was 14 to 16 years old. He was manually and orally assaulted over 100 times, and Purdy also licked his anus. In exchange, and to ensure silence and continued access, Purdy gave Minor Victim A gifts such as

iPhones that he had ordered from the United States. Purdy had Minor Victim A watch pornography to remain erect. When Minor Victim A pushed back on the abuse, Purdy bribed him with more expensive things, such as videogames, musical instruments, another phone, and cash.

### *Production of Child Pornography*

When a search warrant was executed on Purdy's Utah residence in August 2023, law enforcement seized Purdy's laptop. They located approximately 175 images that appeared to be taken surreptitiously in three different bathrooms. All of these bathrooms have now been identified as bathrooms in Purdy's various Tongan residences. These cameras were deliberately aimed at areas in the bathroom where they were likely to capture the boys naked: one camera was aimed directly at the shower; another was aimed directly at the toilet; a third captured both the shower and toilet. Many of the images depicted Tongan boys in various states of undress. Some depicted the boys showering, while others depicted the boys using the toilet. Their penises were exposed to the camera. In some, one of the boys was masturbating. Minor Victim A and Minor Victim B both identified themselves in these images; they were showering with their penises directly facing the camera, or masturbating on the toilet. Neither knew the pictures were being taken.

Minor Victim A disclosed that while he was unaware of the cameras hidden in the bathroom, he had once discovered a hidden camera disguised as a clock in Purdy's bathroom. Minor Victim A discovered the hidden camera when it automatically connected to his cellphone via Bluetooth. When that happened, Minor Victim A found nude images of himself. When Minor Victim A confronted Purdy about the cameras, Purdy cried and said he would not do it again. Based on the hidden camera photos found on Purdy's computer, this was a lie.

Purdy also sought to produce child pornography in ways other than the cameras hidden in his residences. On one occasion, Purdy sent sexually explicit videos of himself to then-10-year-old Minor Victim D via Facebook messenger and asked for the same types of videos in return. On another, Purdy "catfished" Minor Victim K by posing as an attractive female on Facebook and offering to send Minor Victim K money through "her friend" (Purdy). When Purdy picked up Minor Victim K in his car — ostensibly to take him to get the money — Purdy pulled over, held Minor Victim K down, performed oral sex on him, and recorded the assault on his phone.

Even after his release from Tongan prison, Purdy asked Minor Victim M (the little brother of Minor Victim B) to do a "favor" for him. Purdy told Minor Victim M that he had no money to eat or buy internet for the video games and wanted Minor Victim M's "help." Purdy wanted to suck Minor Victim M's penis, record it, and sell that video for "heaps" of money.

### *Purdy Kept Assaulting Minors Even After Charged in Tonga and Released on Bond*

After Purdy was arrested in Tonga, he continued living with — and abusing — Minor Victim B.  He sucked Minor Victim B's penis almost every day until he fled Tonga. During this time period, Purdy's mother visited Purdy and stayed in his apartment complex; the presence of his mother nearby did not stop Purdy from molesting Minor Victim B. Purdy also continued surreptitiously recording Minor Victims A and B after he was released.  Numerous hidden camera pictures recovered from Purdy's computer were taken in bathrooms located in both of the apartments he lived in between February 2023 and March 2023 — the time period while he was released on bond and before he fled.

Further, when Purdy was released on bond, he sought employment at yet another local Tongan school.  He did not tell the school that he was facing charges for molesting a child.  When that administrator found out and asked Purdy about the pending charges, Purdy's response was to confront her about how she knew.  He falsely told her that there was a gag order in place.

Even after Purdy fled Tonga and returned to Utah, he pressed the U.S. Embassy in Suva to provide an F-1 student visa for Minor Victim A.   He and his parents tried to sponsor Minor Victim A so that Minor Victim A could live with Purdy and attend school in Utah.

Clearly, even being discovered, being under threat of punishment, and being supervised with conditions of release that required regular contact with police, did not deter Purdy.

### *Purdy Must Be Detained Because He is a Danger to the Community and a Flight Risk*

Purdy is a danger to the community given his strong sexual interest in children and images of children.  His criminal sexual compulsion is so compelling that Purdy repeatedly engaged in high-risk behavior for years — he groped Minor Victim L under the table while the victim's family member was sitting at the same table; he forcibly molested Minor Victim K on their first meeting, holding him down and recording it; he forcefully inserted his penis into Minor Victim E's anus, despite the physical pain it caused; he molested victims with close relationships to protective adults who could easily have disclosed the abuse; he convinced parents to let these children live with him.  Even when under indictment for sexually assaulting an 8-year-old in Tonga, Purdy did not change his behavior.  Rather, he continued to molest minors while released on bond and pending trial, convincing those around him that he was unjustly accused.

Purdy appears to be both highly motivated to sexually abuse minors and also confident that he will not be caught and brought to justice — so much so that he enrolled

in law school, a profession that requires candor to the Court. Purdy has never been candid. He has lied under oath, and this Court cannot trust the word of either Purdy or his family members, who also promised that he would return for trial.

Purdy is the ultimate flight risk. Indeed, he fled Tonga pending his trial — claiming that he was both wrongfully persecuted while also swearing to the Court that he would return to Tonga to defend himself from such false accusations. Now a law student, Purdy has no real connections to Pittsburgh and no incentive to travel to Utah to face such serious charges (as he has refused to do in Tonga). Were he to return to his home state of Utah, he would be returning to an environment in which his parents enabled him, protected him after he fled, and funded his travel.

There are no conditions or combination of conditions that will keep the community safe from the defendant or prevent the defendant from attempting to flee. He took a great risk in molesting these boys in small, close-knit Tongan communities, took a great risk in hiding a camera in his bedroom, took a great risk in placing cameras in his bathrooms after being confronted, took a great risk to continue molesting boys even after indictment, took a great risk in fleeing Tonga, and took a great risk trying to sponsor a minor victim on a student visa and bring the sexual abuse back home to the United States. Although the defendant may be relatively young, he already has so many victims. And because Purdy has never been brought to justice — and apparently believes he is immune from facing consequences for his criminal actions after so many years — Purdy is emboldened. When he recognizes otherwise, this Court should have no confidence in Purdy's assurances. There is a significant chance that he would contact his minor victims — who disclosed that they remain afraid of Purdy — either directly or through his contacts in Tonga, and that he would seek to influence their testimony.

Accordingly, the defendant cannot overcome the presumption of detention in this case, and even if he does, no condition or combination of conditions will assure the safety of the community, defendant's presence in court, and prevent any possible contact or tampering with the minor victims, either directly or through his co-conspirators or remaining ties in Tonga.

DATED this 24th day of July, 2025.

*/s/ Joey L. Blanch*
*/s/ Rachel L. Rothberg*

_____

Joey L. Blanch
Assistant United States Attorney
Rachel L. Rothberg
Trial Attorney